This case will be documented to you by 18-0452, American Utility Auditors Incorporated, Henson-Ackley v. Village of University Park, Lt. Co. Arguing on behalf of Lt. Co., Mr. Matthew T. Ingersoll. Arguing on behalf of Henson-Ackley, Mr. Robert L. O'Leary. Thank you. Good morning, counsel. Mr. Ingersoll. May it please the Court. The Illinois Municipal Code places limitations on a municipality's ability to enter into contracts. Two such limitations can be found in Section 8-1-7A and 8-1-7B of the Code. Subsection A prevents municipalities from entering into contracts for which funds that have not been prior appropriated by the current budget. Subsection B prevents municipalities from entering into contracts with certain professional consultants for terms that exceed the term of the mayor, but does allow for those terms to be longer than one year. Why does A apply to this at all? A applies because the general fund was impacted by the contract. I mean, A is an appropriation provision, correct? Correct. It has to be a prior appropriation. Right. But B has its own appropriation provision, that it has to be the appropriation for such a contract has to be in the ordinance for each fiscal year. So, I mean, it has its own appropriation. Why would A's appropriation apply over B's appropriation when B is the more specific statute relating to auditors? You know, that's a good question, Your Honor. So, I mean, the contract is a little contradictory in that it invokes both subsection A and B. Subsection A, so there's an exception to 8-1-7, that is the special fund exception, and the special fund exception exempts municipalities from the prior appropriation requirement. So, basically, subsection A, if the general fund is endangered, the special fund exception cannot apply. So, basically, the statute here, you know, it requires an appropriation of funds, not explicitly, but implicitly, like in some of the other cases. I'm sorry. I think we're probably going to ask the same question. I was going to ask, how is the general fund in jeopardy here in view of the language in paragraph 14 of this agreement? In the middle of that paragraph, there are a couple of sentences that may be key here. It says, in light of these sentences, therefore, this agreement is subject to the special fund rule, and the parties expressly agree that this agreement shall not be deemed to create any debt on behalf of client. Payment of amounts due here under shall be limited to the amounts which should be deposited into the special fund or special assessment. How, in view of that language, is there any jeopardy to the general fund? Your Honor, it's similar to the Supreme Court case in Bailing, which had language that provided that any funds due to an engineer would be paid by a special fund that was going to be set up from the sale of bonds. But what the court found there was that elsewhere in the contract, in the event that bonds weren't sold, payments still needed to be made. So while the contract said that payments shall be made by the special fund, if the bonds weren't sold, there would be no special fund. So the only thing left to pay any debt due under the contract would be the general fund. Here, just like that, it says that language. But elsewhere in the language, for example, one, there's an accelerated damages clause. And that's what was invoked here. The accelerated damages clause isn't based on the amount that was actually collected or would be collected under the agreement. The accelerated damages clause allowed M Audit to collect the entire estimated amount presented in its initial audit findings and reports. So upon completion of its report, it presented, you know, this is what you could collect if you implement all of these things. Now, the audit findings report isn't here, but the complaint suggested that they had found parties that hadn't paid and that there was a gas use tax that hadn't been implemented. If by implementing those, they projected that the municipality would presumably bring in an additional $420,000, double that $840,000 and change in additional revenue. Here, so an estimated amount. So why would that have to be paid out of the general fund if there's this limiting language in paragraph 14? Even pursuant to the acceleration clause, there isn't anything in that acceleration clause, is there? Well, because the lawsuit was filed. So it was a 36-month term of the agreement. The suit was filed after 13 months. You know, even if a special fund had been set up, there's no way that the village would have collected 36 months' worth of tax or fees to pay. So the acceleration clause would have endangered the general fund by making the future obligation of presence. Or else the auditor would have been out of luck, right? Yes. I mean, so. Well, so, but that's not what happened here. What happened here was they got a judgment for $420,000 for, again, for, you know, an estimated 36 months. Now, again, the complaint suggests that the village was not on pace to collect close to what the amount was that they were projected. So, again, it was an estimate. So there was likely going to be a shortfall even if it went, even if it continued. But then even, you know, putting that aside is, and even more in line with Belling, was there's a provision in there that allows AMA to sue the village for breach in the event that a, in the event that the village didn't cooperate in the preparation of the audit findings and report. And at that time, the village would be responsible to pay their reasonable fees. Now, again, there's nothing in the record that tells us what those reasonable fees would have been. But that's a pre-implementation of the tax penalty or pre-implementation obligation that the village undertook at the time that it signed the contract. So, like, right there, you know, at the time of execution, the village was obligated to potentially pay on it, just like in Belling, in the event that the agreement wasn't, the tax was never implemented. And also underlying all this is, you know, it's a tax. And it's an optional tax, not something that needs to be in place. You know, with this damage now, I mean, could the village repeal the tax? So, I mean, it's, I mean, they have been now bound by the, you know, by the judgment. So I would think that the- Bound by the judgment to keep that tax in place? To keep the tax in place, yeah. I mean, how else are, you know, to Her Honor's point, you know, all fees, the only way, you know, to be paid on it would be from the special fund. If they repeal the tax, you know, if there's a $420,000 judgment, you know, what happens? Can they not repeal the tax in order to satisfy the judgment? It's just, you know, 817A and 817B was set up to prevent, like, situations like this. And, you know, when an individual or an entity approaches a municipality and contracts with a municipality, they're charged with knowing what the limits of a municipality's ability to contract. What's the municipality charged with knowing? The municipality is- I mean, they know these limitations also, right? I don't-I wasn't there at the- You weren't there? I wasn't there at the outset of this thing, so I don't-I can't speak to that. But, I mean, the case law is pretty clear that an entity or an individual that contracts with a municipality is-the onus is on them to know. And if you enter into a contract that's void or ultra-varied, the person who enters into the agreement is deemed to be a volunteer. And that's it. I mean, this is- Is that what distinguishes Stalen from this case? Pardon? Is that what distinguishes Stalen, the Stalen case, from this case? Well, what distinguishes Stalen was that that contract wasn't void at the time of execution. So, Stalen-excuse me, sorry. Stalen wasn't void, ebonitio, and ultra-varied at the time of execution. Stalen-it was a school district. The school district allowed them to enter into construction contracts. I understand the facts of Stalen. I just-my question is-so, your distinction is that in Stalen, the municipality, the government entity, was able to enter into the contract at the time that it did. And this contract, based on experience- Exactly. The university part could not enter into it. Exactly, yes. When was the-let me ask this. There was a report, clearly, that was submitted, correct, an audit report? I believe so, yes. When was it submitted? I don't know that. I believe it was-I mean, the agreement was- Could it have been within the term of the mayor? I don't believe so. I mean, the agreement was entered into in-I guess the execution of the agreement is where 817B comes into play, and that was in the fall of 2014 or December of 2014. Right. And then payments began in September of 15. The mayor changed over in April of 15. The new mayoral term started, right? Sure. Yeah. There wasn't-it's a management form of government, so the manager runs it day-to-day. There was a new mayor. My question is this. Is there a way in this contract to separate payment from performance? And the performance, certainly under the contract, could have been done. This audit report could have been prepared within a month, two months, three months, whatever it was. And then the payment provision passed the term of the mayor, but the performance, the employment of the auditor did not. So, again, I mean, AMLON invoked 817B in the contract. 817B, the purpose behind it is to not bind the hands of future boards. So, again, they're professional consultants, 817B, and the contract seeked to exceed the term of the mayor. Whether or not there are ongoing obligations in the contract, like a right to continue to audit, an obligation for AMLON to alert them of potential new savings and ongoing throughout the term. So AMLON had duties under the contract? It's a little vague, but it's, if you look at Section 3, auditors shall provide reason to prompt notice to the client of discovery of all credits, refunds, claims. So, I mean, it doesn't say, you know, it doesn't explicitly limit it to, you know, for use in audit findings and report. But I don't really think that, I mean, I think what's important here is that, you know, they entered into agreement, it exceeded the term of the mayor, and whether or not, you know, they were obligated to employ them or not is, you know, I personally think irrelevant. But... Well, again, doesn't that depend on the question Justice Burke asked is when the performance was completed? Yeah, I mean, well, I guess the record is silent on when performance was actually completed. But, I mean, like in Knizzo, the true test is whether the contract itself deprives the governing body or its successor of the discretion which public policy demands to be left unimpaired. By, you know, creating a 36-month obligation, suing on the 36-month obligation, you know, the village is now bound. You know, if they can't... Bound to pay for services that may have been rendered during the term. I mean, again, section B talks about employment, contracts relating to the employment of an auditor. If the auditor is only employed for a finite period of time, and that is within the term of the mayor, but is to be paid post-term, your argument is that that still violates B. My argument would be, yeah, that that still violates B. Because, again, I mean, they are obligating them beyond the mayor's term. Were they obligated to do anything after the completion of the audit other than send a bill? An audit? Mm-hmm. Again, I mean, it says that they're bound to alert them promptly of any additional credits, refunds, claims that they're aware of. I believe that they had the right to audit or continue to review items, you know, to report. I think, personally, to make sure... More importantly, though, it's the village that's the... Whether the village is bound, not whether the audit body is. I think the favor... One of those cases had the city manager staying on for a month after, and the court pointed out, yeah, the city manager was staying on for a month after to maintain continuity. But during that month period, it was a termination of will. So, I mean, if the village had the ability to terminate any ongoing obligation, then that case would probably kick in. So, I mean, again, whether... Again, I think the record's silent on when exactly the report was done and whether or not it was all completed during the term of the mayor. But the obligation was still there. I mean, beyond the obligation of the village to pay, the agreement did bind. So if they presented the audit findings and report, and the village decided not to implement anything because, you know, maybe they didn't want to implement a gas use tax, maybe they didn't want to start taxing, you know, somebody that hadn't been on the tax rolls for whatever reason, then the new board comes in. And by the terms of the contract, you know, they're frozen. They can't do anything. And the language is so broad that it's not like they couldn't do the specific things, you know. If there's anything that would create the result that they recommended, then the village was bound to do that. So, I mean, again, 817B, so it's a professional consultant coming in, providing a report, and whether or not they accept the report at that time, a new board could come in and independently want to do some of the initiatives that were recommended, completely unaware of the report, that they wouldn't be able to do it because of the existence of the report.  You'll have time on the phone. Thank you. Mr. Dudman. Thank you. May it please the Court, my name is Robert Dudiak. I represent the FLEM audit, who is also the plaintiff in the underlying DuPage County action. How did it get filed in DuPage, by the way? Vending provision in the contract. In the contract. Yeah. It's also where AM Audit is located, and where the work was actually performed, was in DuPage County. So what I thought would be helpful is I want to walk through quickly the contract and what is being done in the contract and what AM Audit does, because I think that would be very helpful, and then diving into the special fund versus municipal exceptions that counsel has argued for why the contract is not enforceable. So very quickly, AM Audit is an audit company, a consulting company. Their clients are all municipalities, and if you read through that contract, there are parts that pertain to cost savings, and so your honors may be saying, well, what is that about? So one of the things, and it's not an issue in this case, but what AM Audit does, or what they can do, is for their municipal clients, they could audit their utility bills, and they're experts at this, and all their clients are municipalities, and they'll say, give us all your utilities, and sometimes they find stuff. Hey, you know, you're being billed for 165 phones or something. You're only using 30. We'll recommend ways that you can save costs. Change your cell phones to this new carrier. Change your Internet. And if the municipality says okay, they implement the findings, and then that's the cost savings portion of the contract. That's what all that means. Not an issue, but I just thought as you were reviewing the contract, that might be helpful. What is that issue in this case is that the other thing that AM Audit does and what they did for University Park is they will analyze, basically, their gas tax rolls. It turns out that everybody who's in a municipality, everybody who's in that square has to pay a gas use tax, but everyone isn't. Why? Various reasons why. Could be the municipality is spreading out, and as they're annexing in land, everyone's not getting added to the roll, people change address, whatever the reason, but everyone isn't paying gas use tax, but everyone is supposed to. So when that portion of the contract, when it says they're going to create a report, what AM Audit does and what they did for University Park is they have a proprietary system of triangulating data, and they come up with a report, which they did in this case, that says here's everybody who isn't on the tax. When? When do they come up with the report? Well, the contract was executed in 2014, so shortly after 2014, they would have done that. We know it was done for sure by September of 15. Which is past the term of the mayor. My question is, do we know when the report was tendered to the village? When was the work done, completed, done by AM Audit? Do we know? Shortly after the contract was executed, in 14. Do we know when? In 14. In 14. Yeah, I believe the Covington, Mayor Covington was re-elected, I believe, in 16. 15, April of 15. The date was done in September of 15, and the contract was in June of 14. Yeah. So is there something in the record that will tell us when the report, the completed report, was given to the village? Is there a date on the report? The report itself is not part of the record, and it is not part of the record. And the reason for that – Well, it's proprietary. It's proprietary, yeah. I understand. We're just looking for a date, that's all. Was the village in it complete? I'm not aware of a specific date that the report is presented, but it would have been shortly after the contract was entered into. The report is just triangulating data. The real work is in drafting and implementing a gas use tax. So then following along with the contract and what is going on, they create the report, they bring it to University Park, or any of the other municipal clients, and they say, these people are not on the grid. Here's the fix. You create a municipal tax. Part of the contract is they help them create the ordinance and all that stuff. And they draft it. And they draft it. Creates it, yeah. So that would have been probably somewhere closer to September 15 because that's when the payments start. It would have been at least two months or more before that because you have to notice up the ordinance. Right. There's municipal law for how that gets passed. It's not instantaneous. The ordinance has to be drafted after the municipality accepts the report and says, hey, we like your findings. Okay, we know what happened here, and they passed the tax, and the taxes started coming in. What if a new mayor came in and wanted to repeal the tax? Basically they would not be able to, at least until the three years is over, to keep paying your contract, correct? No. Justice Burke, I think that that would not be the case because the way this contract is drafted, and I'd love to dive into the special fund, is there's a specific municipal ordinance, gas tax, specific only to the people who are not on the roll who are not on the roll. That has to get noticed up, drafted, approved, go through the channels, get approved, and then it has to be taken and given to NICOR, and NICOR has to say, okay, we'll do this, and then those bills have to go out. So for people to begin paying in September, all this has to be months and months in advance of that. But what ammo on it is paid, and this is the beauty for a municipality, and this is why in time one when we're saying, do you want to do this, they're always like, yes, of course we do, is it's only on the money actually paid. So if they say, hey, we don't want to do this anymore, we think it's unfair to make everyone pay gas tax. I don't know why they would ever do that, but if they said that, we would say, okay, well, what did you collect this month? Well, we decided to repeal it so it was zero. Okay, we don't get anything. We cut 15 people off the list. This has happened. I've represented this company for a long time. It could be that there's a big mill or a corporation, and they say, we shouldn't have to pay all this. Now this is an added expense. We were not paying this for years. And the municipality will say, we're going to take them off because we've got a special deal. Well, the way this contract is drafted, it's only on the remittance that NICOR creates specific to this ordinance. Half of that goes to ammo on it, and that's it. And if they decide to take people off of the grid, don't charge everyone, repeal it, well, we wouldn't get our money. Well, doesn't the acceleration clause mean that the village would have to dip into the general fund to pay ammo on it? I think that the language in paragraph 14 is very specific that they can't do that, that there is an acceleration clause, but in no case is the village obligated to pay any money out of its general fund. Again, as I was preparing for this argument, I went right back into paragraph 14 of the contract, because even with the benefit of we have nine lawyers, if we said this is exactly what the issue is going to be, but here's what we're going to do. We're going to create a special revenue that you're not receiving right now. But all the work is done, and then we just pay us over three years, and you want to do that. Let's draft a way so that this is enforceable. How can we do that? You would do exactly what the parties did here. You would say, all right, we want you, the village, to represent to us that representative warrant, and this is right from paragraph 14, that you have the power in this agreement by yourself, and that you've made all necessary and required appropriations, that means under A or B, you represent to us that you're making all the appropriate appropriations. I'm not there in your accounting room when you're doing this, but you represent that you're doing this. This is how we make the contract enforceable. But then everyone is aware in 2014 that there's a special fund exception. The case law all dates back before 2014. So let's say specifically this is new money coming in, this is new revenue coming in, and let's say specifically that the client, University Park, represents a warrant that all the revenue generated pursuant to this agreement constitutes a special fund, and they will take all necessary steps to ensure that all is required to be paid shall not be made from your general corporate funds. So we're all aware of the special fund rule. If you read those cases, there's an argument in some cases like, hey, you said there was going to be bonds or there was going to be a special fund, but then it turns out that the bonds didn't issue or the money wasn't there or something happened. Are we still bound to the contract? And then you have to analyze, well, it's not really a special fund or it was a special fund. In this case, this is exactly how a special fund is supposed to work. Brand new money that they didn't have before represent to us. That is, that brand new money is coming in. It's only new revenue specific to a specific ordinance that you're placing that in a special fund and you'll only pay us 50% of that. So everything under the contract comes out of the special fund? It has to. I'm talking about the accelerated estimated fees? Yes. The attorney's fees and the costs? Yes. It all would come out of the special fund? It would all come out of the special fund because that's what 14 says. And if they chose to repeal all these taxes and not have anybody come in, you guys get nothing? We would get nothing, right. What about the work loss that you mentioned earlier that if they didn't early on, if you guys didn't follow the procedure or whatever, that you would owe them some money for time spent on their work, basically? It's not applicable here, but I think that that's in there in case we come to them and we say we created the report, you could, you know, add these people to a municipal ordinance for gas use tax, and the municipality says we're not going to do it, none of it. And we say, okay. That would, I mean, I don't think it's an issue now, but that would enable AM Audit to argue to them, well, you know what, we put 20 hours into this or 10 hours into this, can we have something for out-of-pocket expenses or something? But that all would happen within the term of the mayor and shortly after the contractor is executed, so it wouldn't happen after, you know, an A or B trigger would take place. And just real briefly, because I think this is also important, this was a summary judgment case. We filed summary judgment affidavit in support of summary judgment. The dollar amounts that there was an enforceable contract that they breached, it's supported by evidence. That was supported by evidence at summary judgment. The defendant offered no contrary evidence. So for them to say now, well, hey, look, it looks like an estimate or we think that the number is too high or maybe not too high, they could have said that at summary judgment. They were supposed to say that at summary judgment, and they're in a position to know if the number is really not accurate, then at summary judgment they should have said contract is not enforceable. And also, if it is enforceable, we repealed the tax or we only charged this much or we only collected $300,000 or we didn't really collect $800,000. They could have said something, but they said nothing, and they were supposed to do that at summary judgment. Well, they're bound to read about facts at summary judgment, not conclusions. Where is this $420,000 established as a fact in the affidavit? The affidavit is executed by Gray Carr. I know who he is. I know he's the president. I know he said based upon his knowledge, but doesn't 191 require a little more than you just say, hey, I'm the president, I'm picking $420,000? Well, he has the benefit of several months of revenue coming in before University Park stops paying. So he has a basis for saying what the monthly revenue is. That's not in the affidavit. It's not attached to the affidavit. Well, the remittance or some invoice or something is not, but that's what he's basing it on. And he's supported by the contract, which is an exhibit, and the complaint, which alleges facts very specifically. And, again, it's uncontradicted. So, you know, getting back to the special fund, I mean, I understand your argument about the special fund and why it's in there because of Section A and because of the appropriation provision in Section B, and it gets around that, I would imagine. It certainly gets around A, and I can't imagine why it wouldn't get around the appropriation provision in B. But why doesn't a special fund have anything to do with the legislative intent of not binding a future mayor or board to contracts that could go on, you know, for years? Yeah, well, I think what makes this different than, like, the Kinzer case or any of the other employment cases is that its work gets performed up front, and it's really a 36-month payment for the services. It's not as though, you know, what it is saying to a future mayor or somebody down the line, you have to use us as your auditing company. They're not their accountant, for example, and the accounting services, you're cornered, and you can't hire whoever you want as an accountant, as an auditor for any other services in the future. You have to use us because I've got this contract. It's different than that. It's just about getting paid on the work they've performed under the contract and its 36 months of payment. So it's not like a service agreement that goes on for three years. You have to use us, and only us, for services for three years. That's not what the contract is about, and that's why I think it is not what the legislature intended for protecting municipalities. Was this contract terminable at will by the village before you guys did the audit? There's nothing in the contract that says that they would owe anything. So, yes, they could have terminated it at that point. They don't have a quantum error, basically. Well, I'm not saying quantum error, but basically what you're saying is time for it. Yes, they could have terminated it at that point, but they didn't, and this is not the first case I've had on behalf of a municipality or on behalf of the Audit Against a Municipality. In Taiwan, when it's found money and they're not aware of it, I mean, they are correct in their brief when they say they could have passed this ordinance, but what AMAudit is able to do is create the revenue stream, and they are getting the benefit of their revenue stream even until today. What was supposed to happen over the three-year period of time under this contract? Well, there's a municipal gas tax that is specific to people who were previously off the roll who are now on the roll, and those people who are now covered under the brand-new gas use tax pay the gas use tax through NICOR, and it gets remitted back to University Park. So all that happens over the three-year period is people under the brand-new ordinance, half of that is paid to them. Over that three-year period. Over that three-year period. No services, nothing is actually being done. It's just, okay, what was the gas use tax this month? $20,000? Right. Give us $10,000. Okay. Thank you. Thank you very much. Thank you very much. Mr. Ingersoll? Thank you. So just briefly, as far as the affidavit of Mr. Carr, you know, it says that he's collecting the entire estimated audit fee, so it wasn't based on the language of the affidavit. It's very short, but it just says it's based on the estimated audit fee, not based on past collections. So I don't believe it's grounded in fact. But, I mean, a couple of things, you know, by and on its own, you know, argument. Let me ask you this. Did you object to that affidavit in the trial court? Yeah. The summary judgment brief attacked the affidavit. Our response to summary judgment attacked the affidavit. So the agreement did straddle the mayor's terms. I mean, it was entered into 2014, and it sounds like, you know, it's more likely than not, you know, the M1 did the work to prepare the ordinances to make sure the tax was implemented, you know, sometime, you know, it would have been a couple of months before September of 2015. So we're looking at it, you know, did straddle the terms. As far as, you know, I guess just taking a step back with regard to the special fund, I mean, Kinzer says that absent explicit statutory authority, there can't be a special fund. All the cases where special funds were found to exist and be valid are cases where there are large public works projects, and there's the statute that provides, that kind of governs the large public works projects, explicitly authorize and may even mandate the creation of a special fund to pay for the operations of the system. So here, I mean, Kinzer was, you know, it was a special fund case, but it was a convenience case that the city of Chicago's comptroller had set up to, you know, pay certain bills. In explaining why the special fund exception didn't apply, you know, and that it violated Section A of 8-1-7, there was no prior appropriation, and, you know, the court said, I mean, indicted, but said that absent explicit statutory authority, there can't be a special fund. There's no statutory authority that authorizes the creation of a special fund to, you know, pay professional consultant fees. Well, there's no requirement either in the statute. Is there to have an ordinance passed to create a special fund? No, but there's nothing in 8-1-7 that even references a special fund. It's almost a judicial created doctrine. So, I mean, you know, 8- Because of these large projects that go on over the course of years. Right, right, but which this, you know, clearly isn't. And I think it's important here that, I mean, subsection 8, you can't appropriate. A municipality can't enter into contracts that would require them to appropriate funds without a prior appropriation, and that is what, you know, subsection 8 provides. And the contract here, at the time that it was drafted, created obligations that could require the appropriation of funds that hadn't been appropriated yet. How do you appropriate funds when you hire a lawyer to do work? How do you, upon executing the contract, if you want to comply with A, how do you appropriate funds when the lawyer hasn't done an hour of work yet? So, I mean, I guess it would go back to budgeting, and there's, I guess, a legal expense in the budget. I mean, this would be- That's why I think B implies and not A. When you enter into that contract, you have to follow B, which is, in such case, the corporate authority shall include in the annual appropriation ordinance for each fiscal year an appropriation of a sum of money sufficient to pay the amount which, by the terms of the contract, is to become due and payable during the current fiscal year. Right, sure. And that wasn't done here either. So, I mean, it would have violated B as well. Again, I think that, I mean, subsection A is simple. I mean, that's why most municipalities enter into one-year contracts, because of subsection A. I mean, they're limited with what they can do, and for good reason, because, I mean, it's taxpayer funds. And that's why I think, you know, for the benefit of the community, and, you know, there has been shown to be, you know, less than honest people sometimes that have the control of the purse strings, is to protect the taxpayers. And that's what the purpose of limitations of stuff like this. I mean, it would be- I think it's in KINZER, they say that, you know, it's A and B are doing- it's a noble purpose that they're trying to serve. And that, you know, if- and I'm paraphrasing, but if municipalities were given carte blanche to create special funds for any situation, there'd be no end to, you know, the creativity that would ensue to get around the appropriation requirements. And that's what happened here. I mean, the money was not appropriated for this contract, and the general fund is now in danger. And that 817-A, 817-B, that's exactly what they're trying to do. So it's money that's not appropriated because it's money that the city never had before, and now they're collecting it because of the work of ANWR. I mean, it was a tax that they were able to implement at any time. ANWR did point that out to them that they can implement the gas use tax, yes. But, you know, and I'm not going to hold them to, but I mean, you know, when the question was asked, you know, what would happen in the event that there was a breach, a pre-implementation breach, you know, what would happen at that point? Well, ANWR would approach and say, you know, we've done 10 to 20 hours of work. I don't know if, you know, if directing a municipality to a gas use tax should entitle anybody to 36 months of 50 percent of the revenue paid by, you know, all the residents of that municipality. Well, that's what they agreed to. I was just about to say the same thing. I was just going to say it's a little disingenuous for the village to say, hey, we agree to this, and then, oops, we made a big mistake, and we can't do this. I mean, that's not what it says. And that's why you can't buy future administrations. There's elections. People lose elections for making mistakes like this and for doing, and there's been substantial change over in the village board, and there was a new village manager. Again, it's a management form of government. And there was a new manager brought in with the new administration after this election. I mean, it's, and again, it goes back to it can be harsh, but people contracting with the municipality are bound to know the limitations of the municipality. And here, I mean, again, it's an argument. Am Audit drafted this contract with the goal of circumventing. I mean, there can't be a claim that there wasn't awareness of these limitations. Well, there's representation in paragraph 14 that the village was authorized and representative was authorized, I believe. I had the language, and it says, client represents and warrants that it has the power to enter into this agreement bind itself and has passed all the necessary and required appropriations, et cetera. I mean, it made representations here too. I wasn't, I can't speak for what happened at the time the contract was entered into, but I would just redirect it to Justice DeBellin. And DeBellin says that he has looked at the contract as a whole, and if it's implied that the general fund is in danger, then there's a violation of 8-1-7. Thank you, Your Honor. Thank you, counsel, for your arguments today. The court will take the matter under advisement and render a decision in due course.